FILED

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JONATHAN KENDRICK,<br>　　　　Plaintiff,<br><br>v.<br><br>ROCCO MAGNI<br>1000 Louisiana<br>Suite 5100<br>Houston, TX 77002-5096<br><br>And<br><br>SUSMAN GODFREY L.L.P.;<br>1000 Louisiana<br>Suite 5100<br>Houston, TX 77002-5096;<br><br>And<br><br>TILMAN J. FERTITTA<br>1510 Polk Street<br>Houston, TX, 77002;<br><br>And<br><br>PATRICK FERTITTA<br>1510 Polk Street<br>Houston, TX, 77002<br><br>　　　　Defendants. | Case No. CV26- 6009-WLH-DMKx<br><br>**COMPLAINT FOR:**<br>(1) Violation of RICO,<br>　　　18 U.S.C. § 1962(c);<br>(2) RICO Conspiracy,<br>　　　18 U.S.C. § 1962(d);<br>(3) Intentional Infliction of<br>　　　Emotional Distress<br>**DEMAND FOR JURY TRIAL** |

## COMPLAINT

Plaintiff JONATHAN KENDRICK ("Mr. Kendrick") brings this action against

Defendants ROCCO MAGNI ("Magni"), SUSMAN GODFREY L.L.P. ("Susman Godfrey"),

TILMAN J. FERTITTA ("Tilman Fertitta"), and PATRICK FERTITTA ("Patrick Fertitta")

(collectively, "Defendants") for violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961 *et seq.*, and for intentional infliction of emotional distress under California law. Plaintiff alleges as follows on personal knowledge as to himself and his own acts, and on information and belief as to all other matters.

## INTRODUCTION

1. This case concerns a sustained campaign of threats, surveillance, and witness tampering directed by the lawyers for one of the most prominent if not nefarious business families in Texas at the principal adverse witness in their clients' federal litigation. Beginning in January 2022 and continuing through the date of this filing, defendant Rocco Magni and the law firm Susman Godfrey L.L.P., acting in concert with and at the direction of their clients Tilman J. Fertitta and Patrick Fertitta, threatened plaintiff Jonathan Kendrick with extralegal harm putting him in fear of immediate bodily injury or death to himself, his wife, and his family if he continued to pursue claims arising from a 2018 sponsorship transaction between Mr. Kendrick's affiliated companies and the Fertitta-controlled Houston Rockets and Landry's, Inc.

2. The threats were not litigation communications. They were not made in court filings, settlement demands, or pre-litigation negotiations. They were made off the record — by telephone, in person during deposition breaks, and through surveillance of Mr. Kendrick's California offices — and they were intended to deter him from participating in proceedings before this Court's bankruptcy unit and from communicating information about the underlying conduct to federal officials. Mr. Kendrick reported the threats to the Federal Bureau of Investigation and to the Office of the United States Attorney for the Southern District of Texas. He brings this action to recover the concrete business and

property losses he has sustained as a direct result of Defendants' conduct, and the severe emotional distress that conduct independently caused.

3. The conduct alleged here violates the federal witness-tampering and witness-retaliation statutes that Congress made predicate acts for civil liability under the Racketeer Influenced and Corrupt Organizations Act. It also constitutes the intentional infliction of emotional distress under California law. Mr. Kendrick seeks treble damages, punitive damages, injunctive relief restraining further threats and harassment, and the other relief set forth in the prayer below.

## JURISDICTION AND VENUE

4. This Court has subject-matter jurisdiction over Plaintiff's federal RICO claims pursuant to 18 U.S.C. § 1964(c) and 28 U.S.C. §§ 1331 and 1337. The Court has supplemental jurisdiction over Plaintiff's state-law claim pursuant to 28 U.S.C. § 1367(a). The Court additionally has diversity jurisdiction pursuant to 28 U.S.C. § 1332(a)(2): Plaintiff is a citizen of the United Kingdom, all Defendants are citizens of States of the United States, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

5. This Court has personal jurisdiction over Defendants pursuant to 18 U.S.C. § 1965 and Federal Rule of Civil Procedure 4(k)(1)(C). Section 1965 authorizes nationwide service of process in actions under 18 U.S.C. §§ 1962 *et seq.* In addition, the threats, surveillance, and other tortious conduct alleged herein were directed by Defendants into California, where Mr. Kendrick was located and where Able Events, Inc. ("Able Events") maintains its principal place of business. Defendants Tilman Fertitta and Patrick Fertitta, and entities they own or control, have separately availed themselves of California courts

by domesticating a Texas judgment in the Los Angeles Superior Court, Case No. 24SMCP00156.

6. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) and 18 U.S.C. § 1965(a)–(b), because a substantial part of the events giving rise to the claims occurred in this District, including the receipt of threatening communications, the surveillance and harassment directed at Mr. Kendrick at the offices of his company in Culver City, California, and the harm suffered by Plaintiff in this District.

## THE PARTIES

7. Plaintiff JONATHAN KENDRICK is an individual and a citizen of the United Kingdom. Mr. Kendrick is the Chairman of Able Events, a corporation organized under the laws of the State of Delaware and headquartered in California, formerly known as ROKiT Marketing, Inc. Mr. Kendrick brings this action in his individual capacity to redress injuries personally sustained by him as a result of Defendants' conduct.

8. Defendant ROCCO MAGNI is an individual and a citizen of the State of Texas. At all relevant times, Magni was a partner of Susman Godfrey and acted as counsel for Rocket Ball, Ltd. d/b/a the Houston Rockets and Clutch City Sports & Entertainment, L.P. (collectively, the "Rockets"), Tilman Fertitta, and Landry's-affiliated entities.

9. Defendant SUSMAN GODFREY L.L.P. is a limited liability partnership organized under the laws of the State of Texas, with its principal place of business in Houston, Texas. For purposes of diversity jurisdiction, Plaintiff is informed and believes, and on that basis alleges, that no partner of Susman Godfrey is a citizen of the United Kingdom or otherwise shares citizenship with Plaintiff. At all relevant times, Susman Godfrey served

as counsel for the Rockets, Tilman Fertitta, and Landry's-affiliated entities in matters arising from the sponsorship relationship described herein.

10. Defendant TILMAN J. FERTITTA is an individual and a citizen of the State of Texas. At all times material to the conduct alleged in Section A below, Tilman Fertitta was the owner and controlling principal of the Rockets and the owner and Chairman of Landry's, Inc. ("Landry's"), a dining, hospitality, entertainment, and gaming company operating approximately 600 locations worldwide. Although not the highest bidder, TILMAN FERTITTA nevertheless won the right from the National Basketball Association ("NBA") to purchase the club. Following his confirmation by the United States Senate on April 29, 2025, and his presentation of credentials on or about May 6, 2025, Tilman Fertitta has served as United States Ambassador to the Italian Republic and the Republic of San Marino. In connection with his appointment, Tilman Fertitta resigned his executive positions at Landry's and Fertitta Entertainment, Inc., but claims to retain a passive ownership interest in the Rockets and Landry's.

11. It was only after the events set forth in this Complaint occurred, that ABLE EVENTS and MR. KENDRICK learned that the Fertitta family was reported to have mob ties. Incredibly, TILMAN FERTITTA was nevertheless nominated and confirmed to be the U.S. Ambassador to Italy and San Marino. This confirmation regrettably came as no surprise, as the U.S. Senate Foreign Relations Committee did not, even when informed by MR. KENDRICK of the likelihood of mob ties, investigate and looked the other way to likely Mafia connections as result of TILMAN FERTITTA'S huge political contributions lining the pockets of both Republicans and Democrat politicians. TILMAN

FERTITTA and his companies have conveniently, strategically, effectively "bribed" both political parties. A simple review of Federal Election Commission records shows this.

12. Defendant PATRICK FERTITTA is an individual and a citizen of the State of Texas. Patrick Fertitta is Tilman Fertitta's son. At all relevant times, Patrick Fertitta was actively involved in decision-making for the Rockets and acted as a representative of the Fertitta family's interests in connection with the transactions described herein. Patrick Fertitta currently serves as the Rockets' alternate governor and, on information and belief, has assumed day-to-day responsibility for the Rockets' ownership functions following Tilman Fertitta's appointment as Ambassador.

13. TILMAN AND PARTRICK FERTITTA are direct blood descendants of the Maceo crime syndicate — the Sicilian-immigrant family that controlled organized crime in Galveston, Texas for 30 years. His grandfather was Sam Maceo's nephew; the Fertitta family inherited the Maceo rackets upon the Maceos' deaths in the 1950s. An extended family member, Frank Fertitta Jr. (Station Casinos), was investigated for mob-connected casino skimming and had a documented business partnership with Carl Wesley Thomas — the man FBI wiretaps caught teaching the Kansas City mob boss how to skim Las Vegas casinos.

14. TILMAN FERTITTA built his empire in the two most historically mob-penetrated industries — restaurants and casinos — and is currently succeeded at an approximate $7 billion acquisition of Caesars Entertainment that would make him the dominant casino operator in America. He has accumulated multiple New Jersey gaming violations, including personally violating his own license and, most notably, firing his Atlantic City casino's surveillance manager — the primary internal check against cash skimming and

fraud. His restaurant empire has faced repeated class action suits for systematic wage theft across hundreds of locations. In 2021, he agreed to an $8.6 billion SPAC deal, extracted its value, then walked away — resulting in a $12.5 million settlement — mirroring the same pattern of fraudulent inducement set forth below.

15. TILMAN FERTITTA's conduct follows a textbook pay-for-protection pattern and racket: $1.5 million+ donated to Donald J. Trump, personally hosted fundraisers, co-hosted the inauguration after the 2024 presidential election— and, not coincidentally given his "largesse" was nominated for and received the U.S. ambassadorship to Italy. He now incredibly holds a diplomatic post in the country his family's criminal network originated from.

16. TILMAN FERTITTA's "political giving" is deliberately bipartisan — a classic hedge that ensures access regardless of who holds power. He donated $140,000 to Trump and $5,600 to Biden in the same 2020 election cycle, contributed $6,600 to Kamala Harris's 2024 presidential campaign while simultaneously pumping $487,000 into Trump 47 and $1 million to Trump's inauguration, and has donated heavily to Texas Democrats and Republicans alike at the state level, including over $1.1 million to Gov. Greg Abbott. Buying access on all sides of the political spectrum is a textbook "insurance" method for ensuring that no government actor — regardless of party — becomes a law enforcement threat.

17. In addition, equally notable and hardly coincidental are his deep financial ties to law enforcement: TILMAN FERTITTA not coincidentally chairs the board of the Houston Police Foundation (HPD), donated $10 million to build the HPD tactical training center that now also not coincidentally now bears his name, is funding a $10.5 million firearms

training facility also named after him, has pledged $1 million+ in crime rewards directly to HPD, and has conveniently hosted annual police fundraising galas at his personal residence for over a decade. The cultivation and coopting of law enforcement through naming-rights philanthropy — ensuring that the officers most likely to investigate you are also those most indebted to you — has a long and well-documented history in organized crime.

18. In that same vein, Defendant MAGNI's full name is Rocco Filippo Nicola Magni is perhaps not coincidentally a Sicilian name and his role as legal counsel for the FERTITTAS, along with his law firm SUSMAN, have been as their well and handsomely paid surrogate, as pled herein.

19. Plaintiff is informed and has strong reason to believe, and on that basis alleges, that at all relevant times each Defendant was acting in concert with, and as the agent or co-conspirator of, each other Defendant, with the knowledge and authorization of the other Defendants.

## STANDING

20. Mr. Kendrick has standing to bring the claims set forth herein. As a direct and proximate result of Defendants' conduct, Mr. Kendrick has suffered concrete injuries to his business and property, as set forth in detail in paragraph 50 and other paragraphs below. Those injuries are direct injuries to Mr. Kendrick's existing contractual relations and prospective business relations, recognized as protected property interests under California law, and are not damages derivative of any personal injury or emotional distress. They confer standing under 18 U.S.C. § 1964(c) on Mr. Kendrick personally. Mr. Kendrick separately

has standing to assert his California-law claim for intentional infliction of emotional distress, which is pleaded in the alternative under this Court's supplemental jurisdiction.

## RELATIONSHIP TO PENDING ACTIONS

21. This action is related to two pending actions in the Superior Court of California, County of Los Angeles: (a) *Able Events, Inc. v. Rocket Ball, Ltd. et al.*, Case No. 26STCV08054 (filed Mar. 12, 2026) (the "Fraud/RICO Action"), in which Able Events asserts claims for fraud and RICO violations arising from the sponsorship relationship described herein; and (b) *Able Events, Inc. v. Rocket Ball, Ltd. et al.*, Case No. 26STCV08342 (filed Mar. 12, 2026) (the "Equity Action"), in which Able Events seeks equitable relief from enforcement of the domesticated arbitration judgment based on extrinsic fraud.

22. The factual allegations in this Complaint concerning the sponsorship transaction are consistent with those pleaded in the Fraud/RICO Action and the Equity Action. The present action does not seek to relitigate Able Events' fraud claims; it addresses injuries personally sustained by Mr. Kendrick as a result of Defendants' subsequent course of conduct, including threats and retaliatory acts directed at Mr. Kendrick personally.

## FACTUAL ALLEGATIONS

### A. *Background: The Sponsorship Relationship*

23. In August 2018, the Rockets were seeking a jersey patch sponsor for upcoming National Basketball Association ("NBA") seasons. The Rockets retained Excel Sports Management, and its agent Jason Miller ("Miller"), to broker sponsorship opportunities on their behalf.

24. In early August 2018, Miller contacted Clinton Ehrlich ("Ehrlich"), then Chief Marketing Officer of Able Events, to discuss Able Events serving as the Rockets' official jersey sponsor.

25. At that time, ROKiT Drinks LLC ("ROKiT Drinks"), an affiliate of Able Events, maintained a portfolio of alcoholic beverage brands for sale in the United States, including Bogart's Vodka, Bogart's Gin, Bogart's Whiskey, Bogart's Rum, Bandero Premium Tequila, and ABK Beer (collectively, "ROKiT Drinks' Products").

26. From the outset of negotiations, the partnership proposed by the Rockets and their representatives comprised two components: (a) a jersey sponsorship agreement between Able Events and the Rockets, and (b) a beverage distribution and promotional arrangement involving ROKiT Drinks' Products at Landry's locations.

27. On or about August 7, 2018, Miller relayed to Thaddeus ("Tad") Brown ("Brown"), then Chief Executive Officer of the Houston Rockets, and to Patrick Fertitta, Able Events' interest in becoming the Rockets' jersey sponsor, together with the proposed distribution and promotion of ROKiT Drinks' Products at Landry's locations. In a contemporaneous email transmitted via interstate wires, Miller conveyed representations attributed to Patrick Fertitta:

> [Patrick Fertitta] also made it clear that we could push your products at all 600 Landry's owned and operated locations around the world. He even threw out the idea of specialized cocktails at the restaurants promoting the [ROKiT Drinks] brands.

28. On or about August 14, 2018, Mr. Kendrick, acting on behalf of Able Events and in his capacity as an executive of ROKiT Drinks, met with Tilman Fertitta, acting on behalf of the Rockets and Landry's, at Maestro's restaurant in Houston, Texas. Brown, Miller,

Patrick Fertitta, and Ehrlich were also present. The parties reviewed a Partnership Proposal and Presentation dated August 13, 2018, prepared by the Rockets (the "Partnership Proposal"), which described both a jersey sponsorship agreement with the Rockets and a beverage distribution and promotional arrangement with Landry's. The Partnership Proposal represented that ROKiT Drinks' Products would be featured and promoted across Landry's portfolio of dining, hospitality, entertainment, and gaming properties, and that, in the case of Bogart's Vodka, it would be the preferred vodka across all Landry's outlets.

29. During the August 14 meeting, Tilman Fertitta participated in a blind tasting of ROKiT Drinks' Bogart's Vodka against Tito's vodka, his stated preferred brand. To the parties' surprise, Tilman Fertitta selected Bogart's. Mr. Kendrick confirmed at the meeting that, from Able Events' perspective, meaningful beverage distribution and promotional integration with Landry's was an essential component of the overall sponsorship arrangement.

30. On or about August 15, 2018, Miller sent an email to Mr. Kendrick and Ehrlich stating that "[t]his is going to be a monumental partnership for all three organizations (ROKIT, the Rockets, and Landry's Inc.)." Miller indicated that he would be introducing Alison Kennedy ("Kennedy"), then Chief Executive Officer of ROKiT Drinks, to James Kramer ("Kramer"), Vice President of Beverage Operations for Landry's/Fertitta Entertainment, so they could "get the process started on that side of the house" — referring to the beverage component — while Miller and the Rockets would "get going on the sponsorship agreement."

31. Miller subsequently sent a separate email introducing Kennedy and Kramer for the stated purpose of "nail[ing] down all the details necessary to lock in distribution for the portfolio at all 600+ Fertitta Entertainment locations." That same afternoon, Kennedy and Kramer participated in an initial telephone call to discuss the beverage distribution and promotional component.

32. On August 21, 2018, Patrick Fertitta sent an email to Ehrlich, copying Kramer and Landry's/Fertitta Entertainment General Counsel Steve Scheinthall, requesting a call to discuss "how the Rokit spirits division best can integrate within Landry's brands."

33. On or about September 12, 2018 — prior to execution of the Sponsorship Agreement — Brown advised Able Events that the logo to appear on the Rockets' game jerseys would need to be changed from "ROKiT" to "ROKiT Phones," stating that the change was required due to objections from the NBA. Prior to that communication, Able Events had not been informed that the NBA does not permit alcoholic beverage branding on team uniforms. The red-and-white "ROKiT" logo referenced in the agreement was used exclusively by ROKiT Drinks at that time; ROKiT Phones did not launch any products until the spring of 2019.

34. Without prior consultation with Able Events, Brown and the Rockets had presented the existing "ROKiT" logo — the logo of ROKiT Drinks — to the NBA, but represented to the NBA that the logo was associated with a telecommunications business rather than an alcoholic beverage company. The NBA approved the logo's use on team uniforms based on this representation. Following Mr. Kendrick's objection to the proposed logo change, Brown represented on behalf of the Rockets that he had obtained the NBA's approval to permit use of the "ROKiT" logo on the team's jerseys, without disclosing that the NBA's

approval process did not contemplate, and had not been informed of, the beverage distribution and promotional component that the Rockets had represented as part of the overall sponsorship arrangement.

35. On or about October 9, 2018, Able Events and the Rockets executed the jersey sponsorship agreement (the "Sponsorship Agreement"). Under the Sponsorship Agreement, Able Events was obligated to pay, and did pay, the Rockets a base contract price of $9,750,000 for the 2018–2019 season in exchange for advertising and promotional benefits. The Sponsorship Agreement needed to be finalized before the start of the 2018–2019 NBA season on October 16, 2018.

36. In the months following execution of the Sponsorship Agreement, only a limited number of Landry's locations placed ROKiT Drinks' Products on their menus. By approximately July 9, 2019, total sales of ROKiT Drinks' Products to Landry's amounted to approximately $256,421.25. By approximately January 21, 2020, total sales had reached only approximately $440,000 — a fraction of the volumes represented during the sponsorship negotiations. After Able Events made its required sponsorship payments, Defendants ceased advancing the beverage distribution and promotional component and declined to take steps consistent with the representations made during negotiations.

37. A dispute thereafter arose between Able Events and the Rockets concerning Able Events' obligation to make further sponsorship payments under the Sponsorship Agreement, and the Rockets initiated arbitration proceedings. During the arbitration, the Rockets continued to maintain that the beverage component of the parties' relationship was viable and did not disclose that the integrated sponsorship-beverage structure was incompatible with NBA rules or otherwise incapable of performance as represented. The arbitration

resulted in an award in favor of the Rockets, which was confirmed in Texas state court and subsequently domesticated in Los Angeles Superior Court, Case No. 24SMCP00156. The propriety of that judgment is the subject of the Equity Action.

38. Only later, in subsequent litigation — *ROKiT Drinks LLC, ROK Imports Inc. and ROK Stars Ltd. v. Landry's LLC and Fertitta Entertainment Inc.*, Civil Action No. 4:22-cv-01551 (S.D. Tex.) — did Landry's LLC and Fertitta Entertainment Inc. assert for the first time that the beverage distribution and promotional component was illegal under the Texas Alcoholic Beverage Code, including sections 102.07 and 102.16(a)(1). Until those litigation positions were taken, Mr. Kendrick had no reason to know that the integrated sponsorship-beverage structure that Defendants had represented was legally prohibited or incapable of performance as represented.

39. It was Mr. Kendrick's pursuit and continued prosecution of the claims summarized above — and his role as a percipient witness to the Fertittas' conduct in proceedings related to those claims, including Able Events' Chapter 7 bankruptcy case (No. 2:22-bk-11344-WB (Bankr. C.D. Cal.)) — that prompted the campaign of threats, intimidation, and witness tampering by Defendants set forth below. Plaintiff is informed and believes, and on that basis alleges, that Susman Godfrey was retained as counsel to Tilman Fertitta, the Rockets, and Landry's-affiliated entities in connection with the underlying sponsorship dispute and related litigation, and that Magni acted as the partner with primary responsibility for that representation, including in proceedings in Texas state court, in the Bankruptcy Court for the Central District of California, and in subsequent enforcement proceedings in the Los Angeles Superior Court.

**B. Defendants' Threats and Witness Tampering**

40. Beginning on or about January 2022, and continuing thereafter, Magni and Susman Godfrey, acting in concert with and at the direction of their clients Tilman Fertitta and Patrick Fertitta, engaged in a course of conduct directed at Mr. Kendrick personally that went beyond ordinary advocacy or pre-litigation negotiation. The course of conduct was intended to retaliate against Mr. Kendrick for, and to deter him and his affiliated entities from, asserting claims against Tilman Fertitta, Patrick Fertitta, the Rockets, and Landry's-affiliated entities, including by interfering with Mr. Kendrick's participation in proceedings related to Able Events' Chapter 7 bankruptcy case and related litigation.

41. **Predicate Act No. 1 — Tampering with a Witness, Victim, or Informant (18 U.S.C. § 1512).** On or about a date in January 2022, during a telephone call with Mr. Kendrick and his business associate Dean Becker, the CEO of ROKiT Launch, Inc., Magni — acting on behalf of Susman Godfrey and at the direction of and in concert with Tilman Fertitta and Patrick Fertitta — stated, in substance, that they were "coming after" Mr. Kendrick "personally" and his "wife and family." The statement was made in a manner calculated to convey that physical or other extralegal harm to Mr. Kendrick and his family was being threatened, not merely the institution or pursuit of civil litigation. Magni knowingly used intimidation and threats, in violation of 18 U.S.C. § 1512(b), with the intent to: (a) influence, delay, or prevent Mr. Kendrick's testimony in then-pending and reasonably foreseeable official proceedings, including the Chapter 7 bankruptcy proceeding subsequently filed on March 7, 2022; and (b) hinder, delay, or prevent the communication to a federal court, a federal bankruptcy court, or federal law-enforcement officials of information relating to the commission or possible commission of federal

offenses arising from the conduct alleged in the Fraud/RICO Action and the Equity Action. The communication crossed state lines and was made through interstate wires.

42. **Predicate Act No. 2 — Witness Harassment and Retaliation Against a Witness, Victim, or Informant (18 U.S.C. §§ 1512(d), 1513).** In the weeks following the January 2022 telephone call, Mr. Kendrick observed unmarked black vans parked conspicuously outside the offices of his company in Culver City, California, on multiple occasions. On at least one occasion, Mr. Kendrick was followed by such vehicles. When Mr. Kendrick or members of his staff approached the vehicles, they sped away and departed at high speed. Plaintiff is informed and believes, and on that basis alleges, that this surveillance was conducted at the direction of, in concert with, or for the benefit of one or more Defendants in furtherance of, and to compound, the January 2022 threat. The surveillance constituted intentional harassment and continued threats to and  of Mr. Kendrick and thereby hindered, delayed, prevented, or dissuaded him from (a) attending or testifying in then-pending and reasonably foreseeable official proceedings, including the Chapter 7 bankruptcy proceeding subsequently filed on March 7, 2022, and (b) reporting to federal law-enforcement officers or judges of the United States the commission or possible commission of federal offenses, in violation of 18 U.S.C. § 1512(d). In the alternative, the threatening surveillance was undertaken with the intent to retaliate against Mr. Kendrick for his prior assertion of claims arising from Defendants' conduct, in violation of 18 U.S.C. § 1513(b) and (e).

43. **Predicate Act No. 3 — Tampering with a Witness, Victim, or Informant (18 U.S.C. § 1512).** On February 26, 2024, during a deposition of Mr. Kendrick taken in connection with proceedings related to Able Events' Chapter 7 bankruptcy case (No. 2:22-bk-11344-

WB (Bankr. C.D. Cal.)), Magni — during an off-the-record break, and outside the scope of any communicative act made in furtherance of the deposition itself — personally threatened Mr. Kendrick using substantively identical language: that they were "coming after" Mr. Kendrick "personally" and his "wife and family." Defendant Magni, in making these statements, smiled in an offensive and threatening way to say that Mr. Kendrick, his wife, and his family would be subject to immediate bodily injury or death. The statement was made to Mr. Kendrick directly, not in the form of a litigation communication, court filing, or settlement demand, and was not made for the purpose of achieving any objective of the deposition or the underlying litigation. The statement constituted knowing use of intimidation and threats with the intent to influence, delay, or prevent Mr. Kendrick's testimony in an official proceeding and to hinder, delay, or prevent the communication of information to the bankruptcy court, federal law-enforcement officials, or other federal officials, in violation of 18 U.S.C. § 1512(b).

44. Following the off-the-record threat, the deposition resumed on the record. Mr. Kendrick described the threats on the record. The transcript reflects, in relevant part (with intervening exchanges among counsel attempting to moderate the colloquy omitted):

> Mr. Kendrick: ... you also lied to the Texas court — I think your firm represented it when we tried to sue you for our ROKiT Drinks. And you also obtained documents illegally, and please bear in mind, I want to put this on the record, you threatened me personally.
>
> Mr. Magni: I sent you a demand letter, sir.
>
> Mr. Kendrick: No. If I may finish.
>
> Mr. Kendrick: I forgot my train of thought. You also threatened me personally, which normally I wouldn't take as a threat from a lawyer, but because of your client, I was advised possibly to take some bodyguards because your client, as you are aware -- no, not funny. I don't. I take personal threats against me and my family very seriously. Rocket News. "Tillman Fertitta's family has deep

mob ties. It appears Houston Rockets owner Tillman Fertitta and his family have some deep mob ties and is apparently a fourth generation member of a mafia family." Had I have known that, I would have never done business with a man like that. And, therefore, when you threaten me personally, I took it as a personal threat against my life. That's why I don't trust you at all. I don't trust anything you say, anything you produce. I think I have grounds to show that. So that's all I want to say on that.

Mr. Rothberg: Let the record reflect Mr. Kendrick was reading from a news article that he brought with him.

Mr. Mang: Does anyone want to mark that?

Mr. Kendrick: Can we mark this as an exhibit?

Mr. Magni: Counsel can on redirect.

Mr. Mang: Let's just mark this right now for the record, shall we?

Mr. Rothberg: That's 34 I think.

Mr. Mang: Can we make a copy?

Mr. Kendrick: You can have it. I have lots of copies.

Mr. Mang: The court reporter needs it for the record. So why don't we just hand it to the court reporter for the record, we'll mark it as No. 34, then just set it down.

(Exhibit 34 marked)

Mr. Kendrick: There's no need to smirk.

45. Following the deposition, Mr. Kendrick relocated his residence as a direct result of his fear for his and his family's physical safety arising from the threats described above.

46. In addition, employees of companies affiliated with Mr. Kendrick have been subjected to harassment and intimidation, on information and belief, by persons acting at the direction of, in concert with, or for the benefit of one or more Defendants.

47. Mr. Kendrick reported the threats described above to the Federal Bureau of Investigation and to the Office of the United States Attorney for the Southern District of Texas. To Plaintiff's knowledge, no investigative or remedial action has been taken in response to those reports as of the date of this filing.

48. Mr. Kendrick reported the threats to federal rather than local Houston law enforcement after considering, among other things, that Tilman Fertitta serves as Chairman of the Board of the Houston Police Foundation; that he personally donated $2.5 million in 2019 toward the construction of the Tilman Fertitta Family Tactical Training Center, which opened in November 2020 at the Houston Police Academy and bears his name; and that he personally donated an additional $2.5 million in 2025 toward the construction of the Fertitta Family Firearms Training Facility, which broke ground in June 2025 at the same campus and likewise bears his name. These facts are pleaded for the limited purpose of supporting the reasonableness of Mr. Kendrick's decision to seek redress through federal officials. Plaintiff does not allege that any official of the Houston Police Department has acted unlawfully or improperly in connection with the matters alleged herein.

49. Given Tilman Fertitta's widely reported ties to the Mafia[1], these threats have placed Mr. Kendrick and his family in reasonable fear of imminent bodily harm and/or offensive contact.

## C. The RICO Enterprise

---

[1] *See supra* fn. 1.

50. At all relevant times, Defendants conducted their affairs through an association-in-fact enterprise within the meaning of 18 U.S.C. § 1961(4) (the "Enterprise"). The Enterprise consisted of Tilman Fertitta, Patrick Fertitta, Magni, Susman Godfrey, and (as non-defendant participants) the Rockets, Landry's, and other Fertitta-controlled entities through which Tilman Fertitta and Patrick Fertitta conducted business and litigation activity. The Enterprise is distinct from each of its constituent members.

51. The Enterprise had a common purpose: to retaliate against, intimidate, and tamper with Mr. Kendrick — a victim of and witness against the underlying sponsorship-fraud scheme described in Section A above — in order to deter him from pursuing claims and from cooperating in any investigation or proceeding concerning the conduct of Tilman Fertitta and Patrick Fertitta and their controlled entities.

52. The Enterprise had an ascertainable structure and a hierarchical decision-making chain separate and apart from the predicate acts. Tilman Fertitta and Patrick Fertitta directed and controlled the Enterprise as the principals and beneficiaries of the underlying scheme; non-defendant entities (the Rockets, Landry's, and other Fertitta-controlled entities) supplied the institutional resources and economic power deployed in furtherance of the Enterprise's common purpose; and Magni and Susman Godfrey, while nominally counsel of record, themselves participated in directing and operating the Enterprise's retaliatory conduct. The Enterprise had a common purpose, relationships among its participants, and longevity sufficient to permit pursuit of that purpose.

53. Magni's and Susman Godfrey's participation in the Enterprise's affairs went beyond the rendering of legal services to a client. Magni and Susman Godfrey themselves chose targets and timing for the threats described above, personally communicated and

conveyed those threats (including the off-the-record threats described in Predicate Acts Nos. 1 and 3), and coordinated the Enterprise's retaliatory conduct in concert with Tilman Fertitta and Patrick Fertitta. Through such conduct, Magni and Susman Godfrey participated in the operation and management of the Enterprise — that is, they directed, and did not merely advise on, the Enterprise's retaliatory conduct.

54. The Enterprise engaged in, and its activities affected, interstate and foreign commerce, including through the use of interstate wires to transmit threats from Texas into California; through the nationwide operations of Landry's and the Houston Rockets, which provided the underlying business context giving rise to the retaliation; and through the cross-border travel and communications associated with surveillance and intimidation of Mr. Kendrick at his California place of business.

55. Each Defendant participated in the conduct of the Enterprise's affairs, knew the nature and scope of the Enterprise's common purpose, and committed or aided and abetted the commission of the predicate acts described above. The Enterprise's relationships and activities extended over a period of years, predating and continuing beyond the specific events at issue in this Complaint, sufficient to permit the Enterprise to pursue its common purpose.

## D. Pattern of Racketeering Activity

56. The predicate acts alleged above constitute a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5). The acts are related: they share a common purpose (retaliation against and tampering with Mr. Kendrick as a victim and witness), common participants (the Defendants), a common victim (Mr. Kendrick and his family), and a common method (transmission of threats by interstate wires and through in-person

confrontations coordinated with the Fertittas' ongoing legal disputes with Mr. Kendrick and his companies).

57. The pattern exhibits closed-ended continuity, spanning at least from January 2022 through February 2024 — a period of more than two years and comprising at least three predicate acts. Alternatively, and without conceding that the closed-ended continuity alleged above is insufficient, Plaintiff alleges that the pattern exhibits open-ended continuity, in that Defendants' conduct, including the ongoing harassment of Mr. Kendrick's employees alleged above, threatens to continue absent injunctive relief.

## E. Injury to Mr. Kendrick

58. As a direct and proximate result of the conduct alleged in this Complaint, Mr. Kendrick has suffered injuries to his business and property, including: (a) costs of relocating his residence and the base from which he conducts his business operations, undertaken to enable him to continue performing his existing business contracts and pursuing his prospective business relations; (b) costs of personal-security measures undertaken to enable Mr. Kendrick to continue performing his existing business contracts and pursuing his prospective business relations notwithstanding the threats; (c) costs of additional security at the offices of his companies; (d) loss of business contracts and prospective business relations, lost income, and diminished earning capacity attributable to Defendants' conduct; and (e) intentional interference with Mr. Kendrick's existing contractual relations and his prospective business relations, recognized as protected property interests under California law. The injuries alleged in this paragraph are analytically separate from, and not pleaded as damages derivative of, any personal injury or emotional distress Mr. Kendrick may have suffered.

59. The injuries set forth in the preceding paragraph were the direct and foreseeable result of Defendants' conduct, and not the product of any intervening cause. Defendants' surveillance of Mr. Kendrick's California offices was, on information and belief, of a character apparent to employees, vendors, and business invitees of Mr. Kendrick's affiliated companies present at and around those offices, and reduced the scope or frequency of those persons' business dealings with the companies and with Mr. Kendrick himself in his capacity as principal executive of those companies. As a foreseeable consequence of Defendants' threats and surveillance, Mr. Kendrick was unable to perform existing business contracts and pursue prospective business relations on the terms and at the level he otherwise would have, without first incurring the relocation and security expenses set forth above. Defendants knew or should have known that conduct directed at the principal executive of Able Events and ROKiT Drinks-affiliated entities would interfere with Mr. Kendrick's ability to perform existing business contracts and pursue prospective business relations.

60. Mr. Kendrick has also suffered severe emotional distress, including persistent fear for his own physical safety and that of his wife and family, sleeplessness, anxiety, and related psychological harm. These emotional-distress injuries support Count III for intentional infliction of emotional distress under California law and are not pleaded as the basis for RICO standing.

## CAUSES OF ACTION

*Count I — Violation of RICO, 18 U.S.C. § 1962(c)*

*(Against All Defendants)*

61. Plaintiff realleges and incorporates by reference each preceding paragraph as though fully set forth herein.

62. Section 1962(c) of Title 18 prohibits any person employed by or associated with an enterprise engaged in, or the activities of which affect, interstate commerce from conducting or participating, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity.

63. At all relevant times, each Defendant was a "person" within the meaning of 18 U.S.C. §§ 1961(3) and 1962(c), capable of holding a legal or beneficial interest in property.

64. The Enterprise described above is an "enterprise" within the meaning of 18 U.S.C. § 1961(4), and its activities affect interstate commerce.

65. Each Defendant conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs through the pattern of racketeering activity described above, including violations of 18 U.S.C. § 1512 (witness, victim, or informant tampering) and 18 U.S.C. § 1513 (retaliation against a witness, victim, or informant).

66. As a direct and proximate result of Defendants' conduct, Mr. Kendrick has been injured in his business and property as set forth above.

67. Pursuant to 18 U.S.C. § 1964(c), Mr. Kendrick is entitled to recover treble damages, together with the costs of suit and reasonable attorneys' fees.

### Count II — RICO Conspiracy, 18 U.S.C. § 1962(d)

### (Against All Defendants)

68. Plaintiff realleges and incorporates by reference each preceding paragraph as though fully set forth herein.

69. Section 1962(d) of Title 18 makes it unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of Section 1962.

70. Each Defendant knowingly agreed and conspired with one or more of the other Defendants to violate 18 U.S.C. § 1962(c) by agreeing to conduct or participate in the conduct of the Enterprise's affairs through a pattern of racketeering activity, and agreed that one or more of them would commit the predicate acts described above. The conspiracy alleged in this Count II is actionable independently of the substantive violation alleged in Count I, because 18 U.S.C. § 1962(d) creates a separate cause of action for the agreement to violate § 1962(c) regardless of whether the substantive offense is ultimately proved as to every Defendant.

71. Each Defendant knew the essential nature, structure, and scope of the Enterprise and the pattern of racketeering activity, and the participation of each was necessary to permit the commission of that pattern.

72. In furtherance of the conspiracy, Defendants committed the overt acts described above.

73. As a direct and proximate result of Defendants' conspiracy to violate 18 U.S.C. § 1962(c), Mr. Kendrick has been injured in his business and property as set forth above. Pursuant to 18 U.S.C. § 1964(c), Mr. Kendrick is entitled to recover treble damages, together with the costs of suit and reasonable attorneys' fees.

### Count III — Intentional Infliction of Emotional Distress

#### (Against All Defendants)

74. Plaintiff realleges and incorporates by reference each preceding paragraph as though fully set forth herein. Liability is asserted on this Count III against each Defendant directly, on theories of personal participation in the tortious conduct alleged, ratification of that

conduct, and (as to Susman Godfrey L.L.P.) respondeat superior for Magni's acts within the scope of his partnership with the firm. Plaintiff does not assert this Count III on any theory of civil conspiracy among the Defendants.

75. Defendants' conduct, including the threats, surveillance, and witness tampering described above, was extreme and outrageous, exceeding all bounds tolerated by a civilized community.

76. Defendants engaged in such conduct with the intent to cause, or with reckless disregard of the substantial probability of causing, severe emotional distress to Mr. Kendrick.

77. As a direct and proximate result of Defendants' conduct, Mr. Kendrick has suffered severe emotional distress, including persistent fear for his personal safety and that of his wife and family, anxiety, sleeplessness, and related harm.

78. The off-the-record threats described in this Complaint were not communicative acts made in the course of any judicial proceeding, were not made to achieve the objects of any litigation, and bore no logical relation to any pending or contemplated action. The surveillance and physical conduct described in this Complaint were not communicative acts at all. Accordingly, the conduct alleged is not protected by California Civil Code section 47(b) or any analogous privilege.

79. The conduct alleged in this Count III constitutes a continuing course of tortious conduct that began in or about January 2022 and has continued through the date of this filing, including without limitation the threats described in Predicate Acts Nos. 1 and 3, the surveillance and following described in Predicate Act No. 2, and the ongoing harassment of Mr. Kendrick's employees alleged above. Each act of intimidation, threat, surveillance, or harassment caused fresh injury to Mr. Kendrick. Under the continuing-violation

doctrine, the limitations period for a continuing course of tortious conduct does not commence until the conduct ceases. Plaintiff's claim is timely under California Code of Civil Procedure section 335.1 as to each act of intimidation, threat, surveillance, or harassment occurring within two years of the date of this filing, and Plaintiff's claim is timely as to all earlier acts under the continuing-violation doctrine.

80. Defendants' conduct was willful, oppressive, and malicious within the meaning of California Civil Code section 3294, entitling Plaintiff to an award of punitive damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Jonathan Kendrick respectfully prays for judgment against Defendants, jointly and severally, as follows:

a. For compensatory damages, including actual, consequential, and incidental damages, in an amount to be proven at trial but in any event in excess of $25,000,000;

b. For treble damages pursuant to 18 U.S.C. § 1964(c);

c. For punitive damages on Count III pursuant to California Civil Code section 3294, in an amount to be determined by the jury;

d. For preliminary and permanent injunctive relief restraining Defendants and their agents from further threats, surveillance, or harassment of Plaintiff and his family and employees;

e. For reasonable attorneys' fees and costs of suit pursuant to 18 U.S.C. § 1964(c) and as otherwise allowed by law;

f. For prejudgment and post-judgment interest as allowed by law; and

g. For such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff Jonathan Kendrick hereby demands a trial by jury on all claims and issues so triable.

Dated: June 3, 2026

Respectfully submitted,

*Jonathan Kendrick*

Jonathan Kendrick
3617 Hayden Ave
Culver City, CA 90232
Tel.: 855-697-6548
jk@rokit.com

*Plaintiff Pro Se*